**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP,<br><br>Wells Fargo,<br><br>v.<br><br>BARRINGTON PARK OWNER LLC, *et al*.,<br><br>Defendants. | Civil Case No. 23-cv-09972 |

**MEMORANDUM OF LAW IN SUPPORT OF**
**ORDER TO SHOW CAUSE OF APPOINTMENT OF RECEIVER**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

A. Borrower Defendants Obtained a $481 Million Loan Secured by the Collateral Properties. ........ 2

B. Lender is the Owner of the Loan and Holder of the Note. ........ 3

C. Defendants Defaulted Under the Loan Documents By Failing to Repay the Loan at Maturity. ........ 4

D. The Parties Entered into Multiple Post-Maturity Agreements In Which Borrower Defendants Acknowledged the Maturity Default. ........ 4

E. As a Result of the Maturity Default, the Parties Have Agreed to Liquidate the Collateral Properties Through a Series of Sales. ........ 5

F. Borrower Defendants Agreed that Lender Has the Right to a Receiver. ........ 6

G. Borrower Defendants' Inactions Since the Maturity Default Heighten the Need for a Receiver ........ 8

1. Borrower Defendants' Neglect of the Collateral Properties Has Triggered a Downward Spiral In Condition and Revenue ........ 8

2. Borrower Defendants Refuse to Fund Reserves to Required to Support the Collateral Properties ........ 9

3. Borrower Defendants' Failure to Maintain the Collateral Properties Is Creating Hazardous Life and Safety Conditions ........ 10

ARGUMENT ........ 12

I. Lender is Entitled to a Receiver By Agreement ........ 12

II. Lender is Entitled to a Receiver to Protect the Collateral from Waste ........ 15

III. The Receiver Should Be Empowered to Market and Sell the Collateral Properties. ........ 19

IV. The Proposed Receiver is Well-Qualified ........ 21

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of America, N.A. v. BK Inner City Chicken Inc.*,
Case No. 09-06789-LAK (S.D.N.Y. Feb. 5, 2013) ....................21

*Citibank, N.A. v. Nyland (CF8) Ltd.*,
839 F.2d 93 (2d Cir. 1988)....................13, 15

*D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*,
550 F. Supp. 2d 481 (S.D.N.Y. 2008)....................13, 16

*Miss Jones LLC v. Stiles*,
No. 17 Civ. 1450 (NSR), 2019 WL 3034906 (S.D.N.Y. July 10, 2019)....................16

*Rosen v. Siegel*,
106 F.3d 28 (2d Cir. 1997)....................15

*RSS CSMC2021 – ADV - DE AUR, LLC v Adventus US Realty #4 LP*,
Case No. 23-0231 (S.D.N.Y. Sep. 22, 2023)....................20

*Ryan Beck Co., Inc. v. Daly Holdings, Inc.*,
No. 06 Civ. 5349, 2006 WL 3775964 (S.D.N.Y. Dec. 19, 2006)....................16

*United States v. Trusty Capital, Inc.*,
No. 06 Civ. 8170 (KMK), 2007 WL 44015 (S.D.N.Y. Jan. 5, 2007)....................17

**Other Authorities**

28 U.S.C. § 3007....................20

28 U.S.C. § 959(b)....................15, 20

28 U.S.C. § 2001(a)....................20

28 U.S.C. § 3103....................15, 20

Fed. R. Civ. P. 66....................15

## INTRODUCTION

Based on the parties' agreement and applicable legal standards, plaintiff Wells Fargo Bank, National Association ("Plaintiff" or "Lender"), as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP, is entitled to the appointment of a receiver to, among other things, preserve the multi-family apartment residences owned by the defendants ("Borrower Defendants"), which serve as collateral to secure a defaulted $481 million loan ("Loan") owed to Lender. The receiver also should be empowered to continue the existing plan to market and sell those properties to maximize the value of the collateral and protect it from further and future waste.

The Loan matured on July 9, 2022, but Borrower Defendants failed to repay the Loan resulting in an acknowledged maturity default. Since then, Lender has attempted to work with Borrower Defendants and their members to satisfy the Loan, including through consensual sales of select Collateral Properties.[1] Nevertheless, Borrower Defendants have failed to repay the Loan, and triggered additional defaults under the parties' loan and security agreements, as well as post-maturity agreements entered into by the parties.

With the Loan in default, Borrower Defendants have neglected to maintain and placed in jeopardy the Collateral Properties, as well as failed to reasonably protect the health and safety of their tenants and the public. Borrower Defendants' neglect of the Collateral Properties has caused and continues to cause their condition to degrade significantly, creating health and safety issues and waste of the collateral. Municipalities have begun to issue condemnation notices. Creditors

---

[1] Borrower Defendants listed in Part A of Ex. 1, attached to the Wheeler Decl., hold title to the respective collateral property (collectively, "Collateral Properties", and each a "Collateral Property"). Borrower Defendants listed in Part B of Ex. 1, attached to the Wheeler Decl., have sold the respective Collateral Properties ("Released Collateral Properties"), which have been released as security for the Loan.

have begun to place liens on the Collateral Properties and the continuation of crucial services is in jeopardy. All of this poses an imminent threat of waste, undermining the value of the Collateral Properties.

Given the immediate risks posed to the Collateral Properties, Lender seeks the appointment of Chris Neilson ("Proposed Receiver"), a managing partner of Trigild Inc., as receiver empowered to take possession, manage, conserve, market, sell, and collect receipts, rents, and income due on each Collateral Property. Lender's request should not be controversial given Borrower Defendants' express consent to the appointment of a receiver, both in the original security agreements and in the Post-Maturity Loan Documents (defined herein). Moreover, the deteriorating state and present risk to the Collateral Properties justifies the appointment of a receiver. Accordingly, Lender requests that the Court enter Lender's proposed form of appointing the Proposed Receiver (the "Proposed Receiver Order").

## FACTUAL BACKGROUND

### A. Borrower Defendants Obtained a $481 Million Loan Secured by the Collateral Properties.

On June 19, 2019 ("Loan Origination Date"), JP Morgan Chase Bank, National Association ("JPMCB") made the Loan to Borrower Defendants, individually and collectively, in the original principal amount of $481,000,000.00. (*See Declaration of Whitney B. Wheeler in Support of Plaintiff's Request for Appointment of Receiver* (the "Wheeler Decl.") at ¶ 7.) In connection with the Loan, each Borrower Defendant and JPMCB executed the Loan Agreement, dated as of the Loan Origination Date (as amended, "Loan Agreement," attached to the Wheeler Decl. as Ex. 3). (*Id.* at ¶ 8.) In accordance with the Loan Agreement, each Borrower Defendant also executed a Promissory Note dated as of the Loan Origination Date payable in the original principal amount of $481,000,000.00 ("Note", attached to Wheeler Decl. as Ex. 3). (*Id.* at ¶ 9.)

The respective obligations of each Borrower Defendant under the Note and the Loan Agreement are secured by a first priority security instrument including, either a Mortgage, Deed of Trust, or Deed to Secure Debt, executed by the respective Borrower Defendant for the benefit of JPMCB and recorded in the county where each Collateral Property is located (collectively, the "Security Instruments," attached to the Wheeler Decl. as Ex. 5.1 through 5.43). (*Id.* at ¶ 10.) Based upon representations in the Loan Agreement, each of the Defendants is (and is required to be) a special purpose entity, owning in their respective capacity the Collateral Property. (*Id.* at ¶ 11; *see also* Wheeler Decl. Ex. 3 (Loan Agreement) at § 4.30.1.)

**B. Lender is the Owner of the Loan and Holder of the Note.**

Lender is the current owner of the Loan and is the holder of the Note. (*Id.* at ¶ 12.) Lender's acquisition of the Note is evidenced by an Allonge, dated July 18, 2019 ("Allonge," attached to the Note and included in Wheeler Decl., Ex. 4). (*Id.* at ¶ 13.) JPMCB made parallel assignments of the Security Instruments in favor of Lender by a distinct series of assignments, which were recorded in the applicable mortgage records (collectively, "Assignments") (attached to the Wheeler Decl. as Ex. 6.1 through 6.43). (*Id.* at ¶ 14.) JPMCB also made an additional parallel assignment of all of the other loan documents executed at origination ("Origination Loan Documents") pursuant to the General Assignment executed by JPMCB in favor of Lender, dated as of July 18, 2019 ("General Assignment", attached to the Wheeler Decl. as Ex. 7). (*Id.* at ¶ 15.)

Lender is in possession of original copies of the Note, Allonge, Origination Loan Documents, the Assignments, and the General Assignment. (*Id.* at ¶ 16.) By virtue of the Allonge, the Assignments, and the General Assignment, Lender possesses all rights, title, and interest in the Loan.

### C. Defendants Defaulted Under the Loan Documents By Failing to Repay the Loan at Maturity.

The Loan matured by its terms on July 9, 2022 and the Loan balance became immediately due and payable on that date. Borrower Defendants, however, failed to repay the Loan. (*Id.* at ¶ 17.) Accordingly, on July 15, 2022, Lender had a letter sent to each Borrower Defendant ("Maturity Default Notice") (i) providing notice of an Event of Default for failure to "pay the entire outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due under the Loan Documents on the Maturity Date of the Loan" (*i.e.*, the Maturity Default), and (ii) demanding repayment of the Loan ("Maturity Default Notice," attached to the Wheeler Decl. as Ex. 8). (*Id.* at ¶ 18.) Nonetheless, Borrower Defendants still failed to repay the Loan. (*Id.*)

### D. The Parties Entered into Multiple Post-Maturity Agreements In Which Borrower Defendants Acknowledged the Maturity Default.

Following the Maturity Default, Borrower Defendants entered into a Forbearance and Loan Modification Agreement with Lender ("Forbearance Agreement," attached to the Wheeler Decl. as Ex. 9), in which Borrower Defendants acknowledged the Maturity Default. Specifically, Borrower Defendants acknowledged that

> Defaults and Events of Default have occurred and are continuing under the Loan Documents as a result of (i) Borrower's failure to pay the entire outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due under the Loan Documents on the Maturity Date of the Loan….("**Current Defaults**").

(Wheeler Decl. Ex. 9 (Forbearance Agreement) at Recital G; *see also id.* at § 1.1 ("The foregoing recitals are incorporated herein as a substantive, contractual part of this Agreement."); *id.* at § 3.4 (representing only known defaults are "Current Defaults"); *id.* at § 3.6 (agreeing that "as a result of the Current Defaults, interest on the outstanding principal balance of the Loan will accrue at the Default Rate").)

**E. As a Result of the Maturity Default, the Parties Have Agreed to Liquidate the Collateral Properties Through a Series of Sales.**

After failing to repay the Loan after the Maturity Default, Borrower Defendants embarked on a plan to market and sell the Collateral Properties, through a series of sales to third-party buyers, and remit proceeds in partial repayment of the Loan. The parties acknowledged this plan in the Forbearance Agreement, which specifically memorialized Borrower Defendants' agreement to begin selling individual Collateral Properties and remitting the proceeds to Lender:

> In consideration of this Agreement . . . Borrower shall during the Forbearance Period (a) on or before the Inside Closing Date or the Outside Closing Date (as applicable), complete the Sale of each Individual Property and deliver to Lender all proceeds from such Sales (to the extent such proceeds do not exceed the full payment of the Obligations)[.]

(Wheeler Decl. Ex. 9 (Forbearance Agreement) at § 1.3.)

Borrower Defendants' plan to market and sell the Collateral Properties continued after the Forbearance Period ended and through the commencement of this action. (Wheeler Decl. at ¶ 24; Ex. 10.1-10.7.) Indeed, Borrower Defendants began liquidating Collateral Properties in October 2022 through September 2023. (Wheeler Decl. at ¶ 23-24; Ex. 10.1-10.7). As of November 29, 2023, Borrower Defendants reported that seven Collateral Properties – the properties commonly known as Colonial Forest, Northwood, Galloway Village, Hilliard Village, Riverside Ranch, Shadow Creek, and University Hill – are under contract and (at least ten other Collateral Properties are the subject of on-going sale negotiations. (Wheeler Decl. at ¶ 24; Ex. 10.7.)

As discussed below, Borrower Defendants and Lender further agreed to vest the power in a receiver to sell the Collateral Properties, which will both protect them from further waste given the absence of funds to maintain them and allow Lender to preserve the value of its collateral in the hopes of paying off the Loan.

### F. Borrower Defendants Agreed that Lender Has the Right to a Receiver.

Under each of the Security Instruments, the respective Borrower Defendant expressly and unconditionally agreed to the appointment of a receiver upon the occurrence of an Event of Default. (Wheeler Dec. at ¶ 25.) For example, § 7.1 of the Security Instrument with respect to the Collateral Property known as "Galloway Village" provides:

> **Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may** take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions…: …(g) **apply for the appointment of a receiver**…without notice **and without regard for the adequacy of the security of or for the Debt and without regard for the solvency of Borrower**, any guarantor or any indemnitor with respect to the Loan or of any Person liable for the payment of the Debt[.]

(Wheeler Decl. Ex. 5.1 (Galloway Village Mortgage) (emphasis added).) Each Security Instrument contains a substantively similar provision granting Lender the right to a receiver. (Wheeler Decl. at ¶ 25.)

Borrower Defendants further consented to the appointment of a receiver in the Forbearance Agreement. (*Id.* at ¶ 26.) In § 3.11(d) of the Forbearance Agreement, Borrower Defendants agreed that Lender:

> **may move** or make application to a court of competent jurisdiction **for the appointment of a receiver** [for the Collateral Property] **and shall be entitled to such appointment, as a matter of strict right**[.]

(Wheeler Decl. Ex. 9 (Forbearance Agreement) (emphasis added).)

Section 3.11(d) further provides that Borrower Defendants irrevocably consented to a receiver and waived any objection or opposition to any motion for a receiver:

> (i) **irrevocably consent to such receiver appointment**, (ii) **knowingly and voluntarily waive any and all defenses to**, and any and all rights to enjoin, appeal or otherwise interfere with, hinder or

> impede, **any such motion, application or receiver appointment**, … (iv) agree not to oppose any motion or application by Lender for such receiver appointment, (v) shall cooperate and take all actions and execute and deliver all documents requested by Lender in order to effectuate such receiver appointment, including any other or further stipulations and/or consent orders to be filed with the applicable court of competent jurisdiction, and (vi) shall cooperate in connection with such receiver appointment by transitioning management and operational control of the Mortgaged Property to such receiver.

(*Id.* (emphasis added).)

Borrower Defendants further agreed in Section 3.11(d) of the Forbearance Agreement that any receiver sought by Lender shall be vested with the "usual powers and duties" of receivers, including the ability to exercise control over the Collateral Properties to preserve them and prevent waste, whether by possessing, maintaining, operating or selling the Collateral Properties:

> **any order appointing such receiver shall provide receiver with all of the usual powers and duties of receivers** under applicable law and/or pursuant to local custom, **including the full power to take possession of, hold, develop, rent, lease, sell, manage, maintain, operate and otherwise use or permit the use of the Mortgaged Property** upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances. **Such receivership may**, at the option of Lender and unless otherwise limited by any order appointing such receiver, **continue until full payment and performance of the Obligations or until title to the Mortgaged Property shall have passed by foreclosure sale, receiver sale or deed in lieu of foreclosure. Lender**, in its sole discretion, shall be entitled to prosecute through completion in any Civil Action one or more causes of action for foreclosure of the Security Instrument, to have the Mortgaged Property sold by foreclosure sale or receiver sale in accordance with applicable law [and] to obtain any judicial order confirming or approving any such sale[.]

(*Id*. (emphasis added).)

Notably the Forbearance Agreement specifically provides that the Receiver shall have "full power to take possession of [and] …sell … the Mortgaged Property upon such terms as said receiver may deem to be prudent and reasonable under the circumstances…." (*Id.*)

### G. Borrower Defendants' Inactions Since the Maturity Default Heighten the Need for a Receiver

#### 1. Borrower Defendants' Neglect of the Collateral Properties Has Triggered a Downward Spiral In Condition and Revenue

As multifamily apartment complexes, the Collateral Properties are income-generating properties. (Wheeler Decl. at ¶ 28.) Typically, such properties would be expected to generate sufficient revenue from tenant rents to fund the properties' operational expenses and other costs. (*Id.*) Indeed, the Loan Agreement requires Borrower Defendants to maintain the Collateral Properties in conditions appropriate for their use as multi-family apartment residences. (*Id.* at ¶ 29.) Specifically, Section 5.1.1 of the Loan Agreement requires Borrower Defendants to:

> at all times…keep the Properties in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments, and improvements thereto[.]

(Wheeler Decl. Ex. 3 (Loan Agreement) at § 5.1.1.) Section 5.1.12 of the Loan Agreement similarly requires Borrower Defendants to continue their "maintenance, management, and operation of the Properties." (*Id.*) Despite these obligations, Borrower Defendants have failed to keep all of the Collateral Properties "in good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments, and improvements thereto." (Wheeler Decl. at ¶ 31.) As a result, the Collateral Properties are unable to generate sufficient revenue.

To be sure, Borrower Defendants' failure to maintain the Collateral Properties in good working order and repair has resulted in tenants vacating apartments – in several cases following condemnation by local authorities. (*Id.* at ¶ 32.) Due to their deteriorating conditions, the Collateral Properties do not attract replacement tenants resulting in decreased occupancy. (*Id.)* Decreasing occupancy, in turn, results in a further drop in revenue, which correspondingly further

impairs the ability to maintain the properties. (*Id.*)

This downward spiral is evidenced by the fact that rent collections at the Collateral Properties have been dropping monthly and have become insufficient to satisfy Borrower Defendants' operational expenses and debt service obligations. (*Id.* at ¶ 33.) For example, in August and September 2023, Borrower Defendants' cash management account maintained by Lender contained insufficient funds to make required disbursements. (*Id.*) As of August 24, 2023, Borrower Defendants' cash management shortfall was $495,228.47 and as of September 19, 2023, it was $2,232,217.05. (*See* August 2023 Shortfall Notice and September 2023 Shortfall Notice, each attached to the Wheeler Decl. as Ex 13 and Ex. 14, respectively.)

Generally, when Borrower Defendants' cash management account experiences a shortfall, the following month's collections are applied to satisfy amounts that haven't been paid. (Wheeler Decl. at ¶ 34.) Through September 2023, the cash management account had sufficient funds to cure the prior-month's shortfall. (*Id.*) However, because the Collateral Properties have been losing revenue (as discussed *supra*), Borrower Defendants' cash management shortfalls have been increasing and it is taking *more* than one month's rent collection to cover *one* month's debt service and operational expenses. (*Id.*) As of November 9, 2023, funds on deposit in the cash management account were insufficient by $1,656,04.09 to satisfy Borrower Defendants' *October* 2023 disbursement obligations. (*Id.*)

### 2. Borrower Defendants Refuse to Fund Reserves to Required to Support the Collateral Properties

On or about June 5, 2023, Lender released $1,700,000.00 in Forbearance Reserve Funds (as defined in the Forbearance Agreement) for "the payment of any and all costs incurred in connection with the operation, management and/or maintenance of the" Collateral Properties, as provided for in the Forbearance Agreement. (*Id.* at ¶ 35; *see also* Ex. 9 (Forbearance Agreement)

§ 2.3(b).) With the depletion of this account, Borrower Defendants were required, pursuant to the Forbearance Agreement, to deposit $1,700,000.00 with Lender to replenish the Forbearance Reserve Funds on or before July 7, 2023. (*Id.* at ¶ 36; Ex. 9 (Forbearance Agreement), § 2.3(a).) Despite repeated written demands, Borrower Defendants failed to make this payment, resulting in a reserve deficit ("Forbearance Reserve Deficit"). (*Id.* at ¶ 37.) These funds are crucial to provide funds for the operation and maintenance of the Collateral Properties. (*Id.* at ¶ 38.)

### 3. Borrower Defendants' Failure to Maintain the Collateral Properties Is Creating Hazardous Life and Safety Conditions

In September and October of 2023, Lender caused Allegiant Commercial Asset Services Group ("Inspector") to inspect the Collateral Properties. (*Id.* at ¶ 39.) The Inspector issued inspection reports, which included narrative descriptions and a numerical score reflective of each Collateral Property's condition according to definitions established by the Mortgage Bankers Association ("MBA Guidelines"). (*Id.*) Five of the Collateral Properties received the worst rating, "5" out of "5". (*See Declaration of Tina Walters in Support of Plaintiff's Request for Appointment of Receiver* ("Walters Decl."), Ex. A through AA.) According to the MBA Guidelines, such properties exhibit inferior conditions, multiple non-functioning building components, severe deferred maintenance items, multiple life/safety and continuing code violations. (*See generally*, Walters Decl., Ex. A through AA.)

For example, the Inspection Report for the Collateral Property known as "Chateau Glen Oaks" notes:

> [T]he property has several issues of deferred maintenance, including issues of **potential life/safety**. Life safety concerns include: Dry rot at wood and broken railings at balconies throughout property. Windows throughout property are broken / damaged and have been covered with plastic, these are emergency ingress / egress for units and the **improper repair poses a safety concern**. Building 448 sustained a fire and does not appear to have any repairs being completed; the **building is not secured and is a major life safety**

> **concern**. The **stair support outside of Unit 2 is bent and damaged and one is completely missing. It appears to be the only support for the stairway and should be addressed immediately to prevent a life safety concern**.

(Inspection Report for Glen Oaks attached to the Walters Decl. as Ex. A.)

Seven of the Collateral Properties received the second worst ratings, “4” out of “5”. According to the MBA Guidelines, such properties exhibit deteriorating conditions, life/safety and continuing code violations, among other conditions, with deferred maintenance and life/safety issues not being addressed as quickly as required. For example, the Inspection Report for the Collateral Property known as “Northwood Apartments” notes:

> there is deterioration and potholes forming at the asphalt surface of the interior drives and parking lot. There is debris covering the walkway surface at the breezeways. The vegetation throughout the property is overgrown and in need of maintenance. All of the site dumpster areas require maintenance and housekeeping. The pool is currently closed and unmaintained. The common area stairways have peeling paint. Also noted, one of the buildings has a gutter that is detached from the corner and hanging down.

(Inspection Report for Northwood attached to the Walters Decl. as Ex. G.)

Borrower Defendants, in September 2023, provided their own inspection report that also documents the unacceptable condition of the properties. (Wheeler Decl. at ¶ 21; Ex. 11 (documenting fire damage, roof leaks, rotted decks, potholes, ponding of water, broken windows, broken pool, insufficient lighting, uneven sidewalks and vacant and “down” units, etc.).)

Borrower Defendants’ failure to maintain the Collateral Properties also has resulted in condemnation orders being issued. (Wheeler Decl. at ¶ 40.) For example, on October 18, 2023, the City of Jacksonville, Florida served Lender with five separate initial notices of condemnation and orders to with respect to portions of the Collateral Property known as “Colonial Forest” vacate (“CF Condemnation Orders”, attached to the Wheeler Decl. as Ex. 15.1 through Ex. 15.5). One of these orders states that the entire structure of one building located on the related Collateral

Property is "damaged / deteriorated to the extent it is in danger of collapsed & poses and immediate threat to health and safety", while noting that the same structure is "unfit for human habitation and poses a threat to the health and safety of the occupants." (*Id*.) Recent news articles about the Colonial Forest property report that tenants have been compelled by Jacksonville city authorities to move out of condemned units, including on account of black mold and collapsing floors and ceilings. (*See* News 4 JAX report, Oct. 18, 2023 attached to the Wheeler Decl. as Ex. 16.)

Other properties apparently are similarly at risk. For example, a recent news article reports that the Collateral Property known as "Loganberry Ridge" has at least 1,600 fire code violations which have resulted in criminal charges against Borrower Defendant ROCO-Loganberry and its individual members. (*See* Cleveland.com report Jul. 20, 2023 attached to the Wheeler Decl. as Ex. 17.) Similarly, the Collateral Property known as "Galloway Village" has been the subject of numerous on-going nuisance declaration relating to Borrower Defendants' failure to remove trash and other debris at the property. (*See, e.g.*, Order to Abate Nuisance dated June 22, 2023 attached to the Wheeler Decl. as Ex. 18.) According to these various nuisance orders, all expenses incurred by the local authorities to address the violations are chargeable to Borrower Defendant Galloway Apartments and may become a tax lien against the property. (*Id.*) The Collateral Property known as "Hilliard Village" is also the subject of a public nuisance action, which seeks orders compelling Borrower Defendant ROCO-Hilliard to abate a variety of property maintenance violations, and risks taxes, penalties and costs being charged as liens against the property. (Verified Complaint dated Oct. 5, 2023, attached to the Wheeler Decl. as Ex. 19.)

## ARGUMENT

### I. Lender is Entitled to a Receiver By Agreement

Borrower Defendants agreed in the Security Agreements when they took the Loan, and agreed again in the Forbearance Agreement following its Maturity Default, that Lender is entitled

to the appointment of a receiver following and during the continuance of an Event of Default. While "the appointment of a receiver is considered to be an extraordinary remedy," the Second Circuit has held that "it is entirely appropriate for a mortgage holder to seek the appointment of a receiver where the mortgage authorizes such appointment, and the mortgagee has repeatedly defaulted on conditions of the mortgage which constitute one or more events of default." *Citibank, N.A. v. Nyland (CF8) Ltd*., 839 F.2d 93, 97 (2d Cir. 1988); *D.B. Zwirn Special Opportunities Fund, L.P. v. Tama Broadcasting, Inc.*, 550 F. Supp. 2d 481, 491 (S.D.N.Y. 2008) (where it is undisputed that several events of default had occurred, a contractual provision allowing for the appointment of a receiver strongly supports the appointment of a receiver).

Indeed, the existence of a contractual clause for appointment of a receiver creates a presumption that a receiver should be appointed, and a court should only refuse to do so where equity so requires. *See Nyland (CF8) Ltd.*, 839 F.2d at 97; *D.B. Zwirn Special Opportunities Fund, L.P.*, 550 F.Supp.2d at 491 (where the non-moving party expressly consented to the appointment of a receiver in the parties' contractual agreement, "the party opposing the appointment bears the burden of demonstrating why a receiver should not be appointed[.]").

Here, Borrower Defendants irrevocably consented to a receiver and waived any objection or opposition to any motion for a receiver in the Forbearance Agreement. (Wheeler Decl. Ex. 9 (Forbearance Agreement), § 3.11(d).) Each Security Instrument also provides that upon the occurrence and continuance of an Event of Default, Lender has the right to apply to the Court for the appointment of a receiver without regard to any consideration of the adequacy of the security or solvency of the relevant Borrower Defendant. (*See e.g.* Wheeler Decl. at Ex. 5.1 (Galloway Village Mortgage), § 7.1 ("Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may … apply for the appointment of a receiver…without

notice and without regard for the adequacy of the security of or for the Debt and without regard for the solvency of Borrower").)

Borrower Defendants expressly acknowledged that they failed to repay the Loan at maturity, which is an Event of Default, entitling Lender to the appointment of a receiver. In the Forbearance Agreement, which Borrower Defendants entered following their Maturity Default, Borrower Defendants irrevocably consented to and agreed that Lender may seek the appointment of a receiver for the Collateral Properties and shall be entitled to a receiver as a matter of strict right. (*See e.g.* Wheeler Decl. at Ex. 9 (Forbearance Agreement) § 3.11(d) (Lender "may move or make application to a court of competent jurisdiction for the appointment of a receiver [for the Collateral Property] and shall be entitled to such appointment, as a matter of strict right[.]").)

Borrower Defendants also "irrevocably consent[ed] to…, (ii) knowingly and voluntarily waive[d] any and all defenses to, … or otherwise interfere with, hinder or impede, any such motion, application or receiver appointment, … (iv) agree[d] not to oppose any motion or application by Lender for such receiver appointment, (v) shall cooperate … further stipulations and/or consent orders to be filed with the applicable court ….'"). (*Id. (*Forbearance Agreement) at § 3.11).

Borrower Defendants also agreed to a broad scope of powers and duties for the receiver, including "the full power to take possession of, hold, develop, rent, lease, sell, manage, maintain, operate and otherwise use or permit the use of the Mortgaged Property …." (*Id*.) Borrower Defendants also agreed that the receiver shall "continue until full payment and performance of the Obligations or until title to the Mortgaged Property shall have passed by foreclosure sale, receiver sale or deed in lieu of foreclosure." (*Id*.) The Proposed Receiver Order reflects this scope of powers and duties agreed to by the parties.

Given Borrower Defendants repeated agreement and consent to the appointment of a

receiver and waiver of any objection or defense to such appointment, Lender's application should be granted on this basis alone with the full powers outlined in the parties' agreement.

## II. <u>Lender is Entitled to a Receiver to Protect the Collateral from Waste</u>

Federal courts have recognized the propriety of appointing a receiver at the request of a secured creditor where there is evidence that the property of the defendants will be lost, damaged, or diminished in value if the receiver is not appointed. *See, e.g.*, N*yland (CF8) Ltd.*, 839 F.2d at 97; *accord Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997). Borrower Defendants have abdicated their responsibility to maintain the Collateral Properties and, as a result, the properties have and will continue to fall into disrepair and be subject to the attachment of liens for non-payment of utilities, taxes and expenses, as well as possible condemnation. To preserve the Collateral Properties and protect the residents of these residential properties, Lender is entitled to the appointment of a receiver, as an equitable matter, pursuant to Rule 66 of the Federal Rules of Civil Procedure ("<u>FRCP</u>"). *See* Fed. R. Civ. P. 66 (governing "an action in which the appointment of a receiver is sought.")[2]

District courts consider the following, non-exclusive factors in deciding whether to appoint a receiver as a matter of equity: (1) any imminent danger that the property would be lost, injured, or otherwise lessened in value; (2) fraudulent conduct by the defendant; (3) the inadequacy of available legal remedies; (4) whether the harm to the plaintiff caused by a denial of the appointment

---

[2] Furthermore, this Court has statutory authority to appoint receivers and administer receiverships. *See* Fed. R. Civ. P. 66; 28 U.S.C. §§ 959(b) and 3103(a). Such a receiver is authorized to take possession of the debtor's real and personal property, and "to administer, collect, improve, ease, repair or sell" such property under supervision of the appointing court. *Id*. at § 3103(b). Similarly, section 959(b) provides "[A] trustee, receiver or manager appointed in any case pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in the possession thereof. 28 U.S.C § 959(b).

would be greater than the injury to those opposing the appointment; (5) the plaintiff's likelihood of success in the action and the possibility of irreparable injury to the plaintiff's interest in the property; (6) whether the property is inadequate security for the outstanding debt; and (7) the financial status of the debtor. *Miss Jones LLC v. Stiles*, No. 17 Civ. 1450 (NSR), 2019 WL 3034906, at *2 (S.D.N.Y. July 10, 2019) (citing cases); *D.B. Zwirn Special Opportunities Fund, L.P.*, 550 F.Supp.2d at 489 n.50; *Ryan Beck & Co., Inc.*, 2006 WL 3775964, at *2.

Each of those factors supports the appointment of a receiver as a matter of equity:

(1) ***There is an imminent danger that the Properties will decline in value:*** Borrower Defendants have and continue to neglect their obligation to maintain the Collateral Properties and address life-safety conditions at these residential properties. The evidence shows that already a third of these properties are in crisis. Inspection reports detail unacceptable and sometimes dangerous conditions that Borrower Defendants have allowed to develop. Defendants Borrowers' inaction will result in the remaining properties slipping into crisis and may create an immediate threat to the existing tenants at the Collateral Properties. To preserve the Collateral Properties from further waste, address the degraded condition of those properties, continue the process of selling off those properties to preserve collateral value, and protect the residents, a receiver is crucial.

(2) ***There is risk of fraudulent conduct by Borrower Defendants****:* Notwithstanding Borrower Defendants' obligation under the Loan Documents to provide Lender with financial information relating to the Loan and the Collateral Properties, Borrower Defendants have failed to provide such information, raising the specter of fraudulent conduct. Borrower Defendants failure to provide such information while controlling the funds generated by and necessary to maintain the Collateral Properties, and while disingenuously claiming that they are properly maintaining the

properties despite the evidence that the properties are failing into dangerous disrepair, demonstrates that they are disassembling and attempting to create a misleading picture regarding the status of the Collateral Properties. Even if they were not doing so, Lender need not establish fraud where Borrower Defendants have refused to provide relevant information and have defaulted in payments. *United States v. Trusty Capital, Inc.*, No. 06 Civ. 8170 (KMK), 2007 WL 44015, at *8 (S.D.N.Y. Jan. 5, 2007) (granting plaintiff's motion for appointment of receiver even in the absence of evidence of fraud where defendant defaulted on its payments to plaintiff).

(3) ***Plaintiff's legal remedies are inadequate****:* The Collateral Properties are Lender's crucial, direct-source of recovery. If its collateral is not protected against waste, Lender will have no legal remedy to adequately protect its right to repayment of the Loan. Due to the immediate life and safety needs at the Collateral Properties, the threat of condemnation, and continued degradation of the property condition, delaying the transition of control until Lender can effectuate foreclosure sales in numerous states spread around the country would result in irreparable harm. Moreover, there are no less severe equitable remedies. Lender does not require injunctive relief – it requires control of the Collateral Properties through a receiver so that they can be sold by the receiver or preserved until foreclosed, and this must be done in a manner that is designed to preserve the existing tenants base at the Collateral Properties so as to maintain their value.

(4) ***The harm to the Plaintiff caused by a denial of the appointment would be greater than any potential injury Borrower Defendants***. Over the past eighteen months, Borrower Defendants have disregarded their responsibilities to maintain the Collateral Properties. As noted above, a third of the properties already have fallen into significant disrepair. Borrower Defendants are doing nothing to prevent neglect and waste from undermining the value of the other properties. Government entities have begun condemnation actions, immediately jeopardizing Lender's

collateral and demonstrating Borrower Defendants disregard for maintaining it. Without the protection of a receiver, the rights of tenants under their existing leases will be impaired, life/safety issues will continue and worsen, basic and necessary expenses will go unpaid and Lender will lose the key avenue for recovery under its maturity default claim. Since Borrower Defendants have already abdicated their responsibilities with respect to the Collateral Properties, the appointment of receiver will do little to affect their current position.

(5) ***Plaintiff has a high likelihood of success in this action and faces the possibility of irreparable injury to its collateral without the appointment a receiver***. Lender have already demonstrated that Borrower Defendants have defaulted and, thus, Lender is entitled to remedies under the Loan Documents. Borrower Defendants acknowledged and agreed and as the declarations and exhibits further establish, Lender is the holder of the Note, which has now matured by its terms. All indebtedness is presently due and owing in an amount not less than the unpaid principal balance of $241,645,523.61. Borrower Defendants have acknowledged and agreed, in the Forbearance Agreement, that a Maturity Default has occurred, which is an Event of Default, following their failure to repay the Loan at maturity. Furthermore, the Loan Documents provide express rights to Lender and obligations upon Borrower Defendants following an Event of Default, including the right to a receiver, the right to an accounting, and the other specific performance remedies designed to preserve the value of the collateral and protect Lender while it pursues individual collection on each loan and each piece of collateral. Borrower Defendants further agreed in the Forbearance Agreement that Lender was entitled to a receiver and they would not object to such an appointment. There can be little doubt that Lender will succeed in obtain the relief ultimately sought in this action.

(6) ***The Collateral Properties are inadequate security for Borrower Defendants'***

***outstanding debt under the Loan***. Borrower Defendants' waste at the Collateral Properties threatens their value and impairs their ability to repay the Loan. The appointment of a receiver will help stabilize operations and ensure that the existing cash flow from the Collateral Properties are utilized to pay operational expenses and existing lease obligations are maintained to preserve existing tenants while the Collateral Properties are transitioned.

(7) ***Borrower Defendants appear to be financially distressed***. Borrower Defendants have continually refused Lender's request for information relating to their financial condition. Nevertheless, the fact that Borrower Defendants refuse to support the Collateral Properties or satisfy their obligations under the Loan indicates that Borrower Defendants are at least suffering financial distress. The risk that Borrower Defendants may ultimately be unable to repay the Loan underscores the need to preserve the remaining value of the Collateral Properties through the appointment of a receiver.

In sum, the Loan is in default, and without the appointment of a receiver, it is likely that the Collateral Properties will be in danger of being materially wasted or lost. Borrower Defendants have refused to satisfy their monetary obligations under the Loan Documents. Worse, Borrower Defendants continue to refuse to fund the basic operating expenses needed to operate the Collateral Properties. The immediate appointment of a receiver is therefore needed on contractual, statutory, and equitable grounds to operate each of the Collateral Properties, provide stability and continuity of operations for the tenants at each of the Collateral Properties, and market and sell the Collateral Properties, all of which will serve to protect and preserve the value of Lender's collateral.

## III. The Receiver Should Be Empowered to Market and Sell the Collateral Properties.

The Court should empower the receiver to market and sell the Collateral Properties. Borrower Defendants already expressly consented and agreed in the Forbearance Agreement to the appointment of a receiver with the power to sell the property. This Court has statutory authority

and Southern District precedent supports the exercise of the Court's discretion to empower a receiver to carry out these sales in accordance with Borrower Defendants' agreement. Indeed, doing so will continue the marketing and sale plan currently being carried out for the Collateral Properties and is the best way to preserve them from waste and further degradation of value.

After the Maturity Default and to obtain a reprieve during a Forbearance Period, Borrower Defendants consented and agreed that the receiver would have a broad range of powers, including specifically the "full power to take possession of [and] …sell … the Mortgaged Property upon such terms as said receiver may deem to be prudent and reasonable under the circumstances…." (Wheeler Decl. Ex. 9 (Forbearance Agreement), § 3.11(d).)

This Court, in a proper exercise of its equitable discretion, can empower the receiver to market and sell property of the receivership estate. Specifically, 28 U.S.C. § 3103 expressly provides that the appointing court may authorize a receiver to sell real and personal property:

> The appointing court may authorize a receiver – to administer, collect, improve, repair, or ***sell*** pursuant to [28 U.S.C. 3007] such real and personal property as the court shall direct.

28 U.S.C. § 3103(b)(1)(B) (emphasis added); *see also* 28 U.S.C. § 959(b) (requiring a receiver to manage and operate estate property in the same manner as an owner of possessor of such property). In addition, the federal statutes provide a specific process governing the sales of real property by federally-appointed receivers. *See* 28 U.S.C. § 2001(a) (providing for the sale of real property by court-appointed receivers).

Courts in this jurisdiction previously have granted receivers the power to sell property, especially where a borrower already has consented and agreed that the receiver may have that power. *See e.g., RSS CSMC2021 – ADV - DE AUR, LLC v Adventus US Realty #4 LP*, Case No. 23-0231 (S.D.N.Y. Sep. 22, 2023) at Docket No. 37 at 4 (empowering receiver to sell property of the Receivership Estate) and 12 (authorizing the receiver to engage a real estate broker to market

estate property for sale); *Bank of America, N.A. v. BK Inner City Chicken Inc*., Case No. 09-06789-LAK (S.D.N.Y. Feb. 5, 2013) at Docket No. 60 at 2 (authorizing temporary receiver to sell and convey assets of the receivership defendants).

Doing so here would be a proper exercise of this Court's equitable discretion and in accordance with the parties' post-Maturity Default plan for the Collateral Properties. After the Maturity Default, Borrower Defendants memorialized, in the Forbearance Agreement, the plan to begin selling individual properties from the Collateral Properties and remitting those proceeds to Lender. (Wheeler Decl. Ex. 9 (Forbearance Agreement), § 1.3(a) ("Borrower shall during the Forbearance Period … complete the Sale of each Individual Property and deliver to Lender all proceeds from such Sales….").) Borrower Defendants then continued with the plan to market and sell the Properties after the Forbearance Period, recently reporting that as of November 29, 2023, seven Collateral Properties are under contracts, ten other Collateral Properties are in negotiation for sale, and ten others are awaiting offers. (Wheeler Decl. at ¶¶ 23-24.) Borrower Defendants have committed to remit the proceeds of these sales to Lender. (Wheeler Decl. Ex. 9 (Forbearance Agreement), § 1.3(a).)

Accordingly, the receiver should be empowered, as Borrower Defendants consented and agreed, to continue marketing and selling the Collateral Properties as the "receiver may deem to be prudent and reasonable under the circumstances." (*Id*.) Such an order is in accordance with the parties' agreement, the Court's authority, and will best preserve the value of the collateral from further waste and degradation given the lack of funds to maintain these properties properly.

## IV. <u>The Proposed Receiver is Well-Qualified</u>

Lender has identified Chris Neilson as the Proposed Receiver. Mr. Neilson is Managing Partner of Trigild Inc. ("<u>Trigild</u>") and oversees Trigild's business operations and offices located in San Diego, California, Dallas, Texas, Montclair, New Jersey, Miami, Florida, and Chicago,

Illinois. (*See Declaration of Chris Neilson in Support of Plaintiff's Request for Appointment of Receiver* (the "Neilson Decl.") at ¶ 2.) A true and correct copy of the Proposed Receiver's professional profile is attached as Ex. B to the Neilson Decl.

Mr. Neilson is one of Trigild's principal receivers and has been appointed numerous times as a receiver by state and federal courts, including most recently in New York for the Maxwell Hotel. (*Id.* at ¶ 4.) In addition, he has been appointed by courts outside of New York as a receiver for large real property portfolios or properties similar to the Collateral Properties including a multi-building office park in Princeton, New Jersey; a 4.5 million square foot office portfolio in Houston, Texas; a nationwide mall portfolio with a gross leasable area of over 2,500,000 square feet; and a single-family rental housing portfolio in Texas. (*Id.*)

Mr. Neilson is well qualified to be appointed as the receiver in this case based on his substantial experience serving as a receiver for similar types of collateral assets. In particular, Mr. Neilson has been appointed to serve as the receiver and/or played a supervisory role in Trigild's performance of receiverships for dozens of multi-family complexes. (*Id.* at ¶ 5.) In the majority of those appointments, the properties have been under severe distress at the time of appointment. (*Id.*) As a result, Mr. Neilson is accustomed to working with city officials to rectify code violations, dealing with vendors and lienholders to keep critical services intact and active, addressing fire, life, and safety issues immediately, and maintaining and preserving assets pending sale, foreclosure, or other resolution. (*Id.*)

Beyond his personal qualification and experience, Mr. Neilson will benefit from the resources and experience of his firm, Trigild, and its affiliates including Trigild IVL. Collectively, they have successfully handled over 2,000 court-appointed fiduciary assignments throughout the country, operated multimillion dollar businesses, and liquidated billions of dollars of business, real

estate, fixture/furniture/equipment (FF&E), and related assets. (*Id.* at ¶ 6.) A list of cases in which Mr. Neilson, Trigild, its affiliates, or its individual partners, have served as receiver for large real property portfolios or properties similar to the Collateral Properties is attached as Ex. C to the Neilson Decl.

If appointed by the Court, Mr. Neilson will work with Trigild and any retained property managers at the Collateral Properties to immediately perform a property takeover at each of the individual properties. (*Id.* at ¶ 7.) This process will include initial inspections to identify fire/life/safety issues and notice to any tenants of the receivership. (*Id.*) Mr. Neilson will also prepare an initial funding request and budget to address immediate concerns at each of the Collateral Properties, such as utility shutoffs. (*Id.*) He will then take all necessary actions within the scope of his appointment and the approved budget to preserve and maintain the assets while the best resolution for the Collateral Properties is determined. (*Id.*)

Mr. Neilson has agreed to provide receivership and asset management services at an hourly rate of $300.00, provided that his compensation shall be a minimum monthly amount of $2,500.00 per property. (*Id.* at ¶ 8.) Further, should Mr. Neilson, in his capacity as receiver, be authorized to sell any of the Collateral Properties, Mr. Neilson will oversee the process and would be paid a disposition fee equal to 0.25% of the gross sales price in addition to any commission that may be payable to a real estate broker engaged on behalf of the receivership estate or by any buyer. (*Id.*) These rates reflect the market rate for the type receivership services required in this case and are justified by the size, number, and current state of the Collateral Properties. (*Id.* at ¶ 9.)

## CONCLUSION

Based on the foregoing, Lender respectfully requests that the Court appoint the Proposed Receiver as receiver for each of the Collateral Properties vested with the powers set forth in the Proposed Receiver Order.

Dated: December 13, 2023

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: *<u>/s/ Noah M. Weissman</u>*
Noah M. Weissman
Matias R. Gallego-Manzano
1290 Avenue of the Americas
New York, New York 10104
T: (212) 541-2000
noah.weissman@bclplaw.com
matias.gallegomanzano@bclplaw.com

*Attorneys for Wells Fargo Bank, National Association, as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP*