**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP,

Plaintiff,

v.

BARRINGTON PARK OWNER LLC, *et al*.,

Defendants.

Civil Case No. 23-cv-09972

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**BRYAN CAVE LEIGHTON PAISNER LLP**

1290 Avenue of the Americas
New York, New York 10104
212-541-2000

*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....... 1
STATEMENT OF UNDISPUTED FACTS ....... 3
SUMMARY STATEMENT OF FACTS ....... 3
I. Borrower Defendants Obtained a $481 Million Loan Secured by the Collateral Properties ....... 3
II. Lender is the Owner of the Loan and Holder of the Note ....... 3
III. Defendants Default Under the Loan Documents by Failing to Repay the Loan at Maturity ....... 4
IV. Defendants Acknowledged the Maturity Default ....... 4
V. After the Maturity Default, the Parties Agreed to Liquidate the Collateral Properties Through a Series of Sales ....... 5
VI. Defendants Agreed that Lender Has the Right to a Receiver with the Power of Sale ....... 6
VII. Defendants' Inactions Since the Maturity Default Required the Appointment of Receiver ....... 8
a. Defendants Failed to Maintain the Collateral Properties ....... 8
b. Defendants' Neglect of the Collateral Properties Triggered a Downward Spiral in Condition and Revenue ....... 9
c. Defendants' Failed to Fund Reserves to Support the Collateral Properties ....... 10
d. By Stipulation, Defendants Further Consented to the Appointment of a Receiver ....... 10
e. Receiver's Efforts to Address Degradation ....... 11
ARGUMENT ....... 14
VIII. Lender has Established its *Prima Facia* Entitlement to Summary Judgment ....... 14
a. Maturity Default ....... 16
b. Failure to Replenish the Forbearance Reserve Funds ....... 16
c. Failure to Cure ....... 16
d. The Forbearance Agreement Grants the Receiver the Power of Sale ....... 17
IX. The Forbearance Agreement Obligates Borrower Defendants To Cure the Forbearance Reserve Funds' Deficit ....... 22

X. Borrower Defendants Are Contractually Obligated to Turn Over Financial Accounts ........ 23

CONCLUSION ........ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 11

*Aurora Loan Servs., LLC v. Taylor*,
25 N.Y.3d 355 (2015) .......... 11, 12

*Bank of America, N.A. v. BK Inner City Chicken Inc.*,
Case No. 09-06789-LAK (S.D.N.Y. Feb. 5, 2013) .......... 18

*Bank of New York Tr. Co., N.A. v. Franklin Advisers*,
726 F.3d 269 (2d Cir. 2013) .......... 14

*Cambridge Cap. LLC v. Ruby Has LLC*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021) .......... 16

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .......... 12

*Chlopecki v. Chlopecki*,
296 A.D.2d 640 (3d Dep’t 2002) .......... 17

*Cuadrado v. Zito*,
No. 13 CV 3321 VB, 2014 WL 1508609 (S.D.N.Y. Mar. 21, 2014) .......... 20

*EMI Catlogue P'ship v. CBS/FOX Co.*,
No. 86 CIV 1149 (PKL), 1994 WL 163700 (S.D.N.Y. Apr. 28, 1994) .......... 15

*Fischer & Manell, LLP v. Citibank, N.A.*,
632 F.3d 793 (2d Cir. 2011) .......... 18

*Good Gateway, LLC v. Thakkar*,
220 A.D.3d 570 (1st Dep’t 2023), *leave to appeal dismissed*,
41 N.Y.3d 1014 (2024) .......... 17

*Hotel 71 Mezz Lender LLC v. Falor*,
14 N.Y.3d 303 (2010) .......... 17

*Jin Ming He v. Jong Tien Ho*,
23 A.D.3d 524 (2d Dep’t 2005) .......... 15

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*,
424 F.3d 195 (2d Cir. 2005) .......... 14

*Martinez v. Agway Energy Servs., LLC*,
88 F.4th 401 (2d Cir. 2023) ... 12

*Mergent Servs. v. Nova Info. Sys., Inc.*,
249 Fed. App'x 251 (2d Cir. 2007) ... 19

*Morlee Sales Corp. v. Manufacturers Trust Co.*,
9 N.Y.2d 16 (1961) ... 14

*Prudential Home Mortg. Co. v. Cremele*,
226 A.D.2d 357 (2d Dep't 1996) ... 13

*RSS CSMC2021 – ADV - DE AUR, LLC v. Adventus US Realty #4 LP*,
Case No. 23-0231 (S.D.N.Y. Sep. 22, 2023) ... 18

*Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*,
7 F.3d 1091 (2d Cir. 1993) ... 16, 17

*Sec. & Exch. Comm'n v. Byers*,
08 CIV. 7104 (DC), 2014 WL 12799633 (S.D.N.Y. Feb. 21, 2014) ... 17

*Slamow v. Del Col*,
79 N.Y.2d 1016 (1992) ... 14

*Slatt v. Slatt*,
64 N.Y.2d 966 (1985) ... 14

*Teichman by Teichman v. Community Hosp. of W. Suffolk*,
87 N.Y.2d 514 (1996) ... 14

*U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*,
866 F. Supp. 2d 247 (S.D.N.Y. 2012) ... 18

*Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co.*,
1 N.Y.3d 470 (2004) ... 15

**Statutes**

28 U.S.C. § 754 ... 18

28 U.S.C. § 2001(a) ... 18

28 U.S.C. § 3103(b)(B) ... 18

**Other Authorities**

CPLR § 5228(a) ... 17

Fed. R. Civ. P. 56(a) ... 11

**PRELIMINARY STATEMENT**

Plaintiff WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP ("Lender") is entitled to summary judgment against Defendants[1] for all the relief requested in its Complaint, including judgment, as a matter of law, (i) that the court-appointed Receiver remain in place until the sale or foreclosure of all the Collateral Properties to carry out all the currently authorized duties, including to manage, conserve, and collect receipts, rents, and income due on each remaining Collateral Property; (ii) granting Receiver the authority to market and sell the Remaining Collateral Properties (as defined below); (ii) directing that Defendants meet their obligation under the Forbearance Agreement to fund fully the Forbearance Reserve Funds (as defined in the Complaint) by depositing $1,100,000.00 with Lender, and (iii) directing that Defendants meet their obligation under the Loan Documents to provide an accounting with respect to the Collateral Properties.

Lender has established its *prima facie* case for summary judgment based on the undisputed evidence:

- When Lender commenced this action, it was (and still is) the owner and holder of the Note and Security Instruments. (*See Declaration of Whitney B. Wheeler in Support of Plaintiff's Motion for Summary Judgment* ("Wheeler Decl."), ¶¶ 23, 24.)
- The Loan matured on July 9, 2022 (Answer, ¶ 75) and Defendants failed to repay the Loan in full resulting in a Maturity Default. (Forbearance Agreement, Ex. 13 to Wheeler Decl., Recital G.)
- With the Loan in default, Defendants neglected to maintain the Collateral Properties, which caused their condition to degrade significantly. (*Declaration of Tina Walters in Support of Plaintiff's Request for Appointment of Receiver* ("Walters Decl.") (Dkt. No. 53), Exs. A-AA.)

[1] All terms capitalized but not defined herein have the meanings set forth in the Complaint.

- To avoid further diminution in value, after the Maturity Default, the parties agreed, in the various Consent Agreements and Forbearance Agreement that the best path forward would be to sell the Collateral Properties on an expedited basis. (Wheeler Decl., Exs. 10, 13.)

- To further the parties' plan to sell the Collateral Properties on an expedited basis, Defendants expressly consented and agreed in the Forbearance Agreement to the appointment of a receiver with the power of sale. (Forbearance Agreement, Wheeler Decl., Ex. 13.)

- To avoid further degradation of the Collateral Properties by Defendants, Lender agreed, in the Forbearance Agreement, to release $1,700,000.00 in reserve funds ("Forbearance Reserve Funds") to be used for the payment of operational expenses of the Collateral Properties. (*Id.*, ¶ 50.)

- Simultaneous with the execution of the Forbearance Agreement, on June 5, 2023, Lender released $1,700,000.00 in Forbearance Reserve Funds to be used for "the payment of any and all costs incurred in connection with the operation, management and/or maintenance of the" Collateral Properties. (*Id.*)

- The Forbearance Agreement requires Defendants to deposit $1,700,000.00 with Lender to replenish the Forbearance Reserve Funds by July 7, 2023 (*Id.*, Ex. 13 (Forbearance Agreement)), but Defendants failed to do so. (*Id.*, ¶ 54; *see also Declaration of Seth A. Smith*, dated February 21, 2025 ("Smith Decl."), ¶¶ 5-7.)

- On January 23, 2024, this Court so-ordered a stipulation by the parties, whereby Defendants consented to the relief sought by Plaintiff's motion (Dkt. Nos. 51-56) for the appointment of a receiver during the pendency of this action, but reserved their right to contest whether the receiver may be authorized to sell property of the receivership estate. (So-Ordered Stipulation, Dkt. No. 62.)

- Defendants did not contest that this Court has the authority to appoint a receiver of the Collateral Properties. (Receivership Order, Dkt. No. 71, ¶ 4.)

- Defendants did not contest that good cause existed for the appointment of a receiver in order to preserve and protect the Receivership Estate (as defined in the Receivership Order. (*Id.*, ¶ 5.)

- Defendants did not contest that Chris Neilson, the receiver appointed in this action, is qualified to serve as receiver in this matter. (*Id.*, ¶ 6.)

## STATEMENT OF UNDISPUTED FACTS

Lender refers to its Statement of Material Facts on Motion for Summary Judgment, submitted pursuant to Local Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

## SUMMARY STATEMENT OF FACTS

### I. Borrower Defendants Obtained a $481 Million Loan Secured by the Collateral Properties

On June 19, 2019 ("Loan Origination Date"), JP Morgan Chase Bank, National Association ("JPMCB") made the Loan to Defendants, individually and collectively, in the original principal amount of $481,000,000.00. (Answer, ¶ 57.) In connection with the Loan, each Defendant and JPMCB executed the Loan Agreement, dated as of the Loan Origination Date (as amended, "Loan Agreement," attached to the Wheeler Decl. as Ex. 2). (*Id.*, ¶ 58.) In accordance with the Loan Agreement, each Defendant also executed a Promissory Note dated as of the Loan Origination Date payable in the original principal amount of $481,000,000.00 ("Note", attached to Wheeler Decl. as Ex. 1). (Wheeler Decl., ¶ 18.)

The respective obligations of each Borrower Defendant under the Note and the Loan Agreement are secured by a first-priority, security instrument including, either a Mortgage, Deed of Trust, or Deed to Secure Debt, executed by the respective Borrower Defendant for the benefit of JPMCB and recorded in the county where each Collateral Property is located (collectively, "Security Instruments," attached to the Wheeler Decl. as Exs. 5.1 through 5.43). (*Id.*, ¶¶ 19-20.)

### II. Lender is the Owner of the Loan and Holder of the Note

Lender is the current owner of the Loan and is the holder of the Note. (*Id.*, ¶¶ 23, 24.) Lender's acquisition of the Note is evidenced by an Allonge, dated July 18, 2019, which was firmly affixed to the Note ("Allonge," attached to the Note and included in Wheeler Decl., Ex. 1.). (*Id.*, ¶ 23.) JPMCB

made parallel assignments of the Security Instruments in favor of Lender (collectively, "Assignments") (attached to the Wheeler Decl. as Exs. 7.1 through 7.43.). (*Id.*, ¶ 26.) JPMCB also made an additional parallel assignment of all of the other loan documents executed at origination ("Origination Loan Documents") pursuant to the General Assignment executed by JPMCB in favor of Lender, dated as of July 18, 2019 ("General Assignment", attached to the Wheeler Decl. as Ex. 8). (*Id.* at ¶ 27.)

Lender has been in physical possession of the Loan file which contains the originals of the Loan Documents, including the Note and Allonge, through its custodian or through counsel, since July 18, 2019. (*Id.*, ¶ 24.) By virtue of the Allonge, the Assignments, and the General Assignment, Lender possesses all rights, title, and interest in the Loan. (*Id.*, ¶ 28.)

## III. Defendants Default Under the Loan Documents by Failing to Repay the Loan at Maturity

The Loan matured by its terms on July 9, 2022, and the Loan balance became immediately due and payable on that date. (Answer, ¶¶ 75, 76.) Defendants, however, failed to repay the Loan. (Wheeler Decl., ¶¶ 34, 38; Smith Decl., Ex. 1.) Accordingly, on July 15, 2022, Lender had a letter sent to each Defendant ("Maturity Default Notice"): (i) providing notice of an Event of Default for failure to "pay the entire outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due under the Loan Documents on the Maturity Date of the Loan" (*i.e.*, the Maturity Default), and (ii) demanding repayment of the Loan ("Maturity Default Notice," attached to the Wheeler Decl. as Ex. 11.). (*Id.*, ¶ 33.) Defendants still have not repaid the Loan. (*Id.*, ¶ 40.)

## IV. Defendants Acknowledged the Maturity Default

Following the Maturity Default, Defendants entered into a Forbearance and Loan Modification Agreement with Lender ("Forbearance Agreement," attached to the Wheeler Decl. as Ex. 13), in which Borrower Defendants acknowledged the Maturity Default. Specifically, Borrower

Defendants acknowledged in the Recitals, which were incorporated as a substantive part of the agreement, that

> Defaults and Events of Default have occurred and are continuing under the Loan Documents as a result of (i) Borrower's failure to pay the entire outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due under the Loan Documents on the Maturity Date of the Loan … ("**Current Defaults**").

(Wheeler Decl., Ex. 13 (Forbearance Agreement) at Recital G; *see also id.* at § 1.1 ("The foregoing recitals are incorporated herein as a substantive, contractual part of this Agreement."); *id.* at § 3.4 (representing only known defaults are "Current Defaults"); *id.* at § 3.6 (agreeing that "as a result of the Current Defaults, interest on the outstanding principal balance of the Loan will accrue at the Default Rate").)

## V. After the Maturity Default, the Parties Agreed to Liquidate the Collateral Properties Through a Series of Sales

After the Maturity Default, Defendants embarked on a plan to market and sell the Collateral Properties, through a series of sales to third-party buyers, and remit proceeds in partial repayment of the Loan. The parties acknowledged this plan in the Forbearance Agreement:

> Borrower has requested that Lender temporarily refrain from exercising its foreclosure and receivership remedies with respect to the Mortgaged Property as a result of the Current Defaults, as more specifically set forth herein, in order for the Borrower to complete the sale of the Individual Properties (each, a "**Sale**") and pay the Obligations in full, and Lender is willing to agree to the same subject to the terms and conditions of this Agreement.

(Wheeler Decl., Ex. 13 (Forbearance Agreement) at Recitals, L; *see also* § 1.3 ("The foregoing recitals are incorporated herein as a substantive, contractual part of this Agreement. This Agreement constitutes one of the Loan Documents.")

Defendants expressly agreed to:

> In consideration of this Agreement . . . Borrower shall during the Forbearance Period (a) on or before the Inside Closing Date or the

> Outside Closing Date (as applicable), complete the Sale of each Individual Property and deliver to Lender all proceeds from such Sales (to the extent such proceeds do not exceed the full payment of the Obligations)….

(Wheeler Decl. Ex. 13 (Forbearance Agreement) at § 1.3.)

Defendants began selling Collateral Properties in October 2022. (Wheeler Decl., ¶ 43; Exs. 14.1 to 14.7 (Consent Agreements.)

As discussed below, as consideration for the Forbearance Agreement, Defendants further agreed to vest the power in a receiver to sell the Collateral Properties upon an Event of Default, which was intended to protect them from further degradation given the absence of funds to maintain them and allow Lender to preserve the value of its collateral in the hopes of paying off the Loan. (Wheeler Decl., ¶ 49; Ex. 13 (Forbearance Agreement))

## VI. Defendants Agreed that Lender Has the Right to a Receiver with the Power of Sale

Under each of the Security Instruments, the respective Defendant expressly and unconditionally agreed to the appointment of a receiver upon the occurrence of an Event of Default. (Wheeler Dec., ¶ 21.) For example, Section 7.1 of the Security Instrument, with respect to the "Atwood Oaks" Collateral Property, provides:

> ***Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may*** take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions…: …(g) ***apply for the appointment of a receiver***…without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor or any indemnitor with respect to the Loan or of any Person liable for the payment of the Debt[.]

(Wheeler Decl., Ex. 5.5 (Atwood Oaks Mortgage) (emphasis added).) Each Security Instrument contains a substantively similar provision granting Lender the right to a receiver. (Wheeler Decl., ¶ 21.)

Defendants further consented to the appointment of a receiver in the Forbearance Agreement. (*Id.*, ¶ 47.) In § 3.11(d) of the Forbearance Agreement, Borrower Defendants agreed that Lender:

> ***may move or make application*** to a court of competent jurisdiction ***for the appointment of a receiver*** [for the Collateral Property], ***and shall be entitled to such appointment, as a matter of strict right*** [.]

(Wheeler Decl., Ex. 13 (Forbearance Agreement) (emphasis added).)

Section 3.11(d) further provides that Defendants irrevocably consented to a receiver and waived any objection or opposition to any motion for a receiver:

> (i) **irrevocably consent to such receiver appointment**, (ii) **knowingly and voluntarily waive any and all defenses to**, and any and all rights to enjoin, appeal or otherwise interfere with, hinder or impede, **any such motion, application or receiver appointment**, … (iv) agree not to oppose any motion or application by Lender for such receiver appointment, (v) shall cooperate and take all actions and execute and deliver all documents requested by Lender in order to effectuate such receiver appointment, including any other or further stipulations and/or consent orders to be filed with the applicable court of competent jurisdiction, and (vi) shall cooperate in connection with such receiver appointment by transitioning management and operational control of the Mortgaged Property to such receiver.

(*Id.* (emphasis added).)

Defendants further agreed in Section 3.11(d) of the Forbearance Agreement that any receiver sought by Lender shall be vested with the "usual powers and duties" of receivers, including the ability to exercise control over the Collateral Properties to preserve them and prevent degradation, whether by possessing, maintaining, operating or selling the Collateral Properties:

> ***any order appointing such receiver <u>shall</u> provide receiver with all of the usual powers and duties of receivers*** under applicable law and/or pursuant to local custom, ***including the full power to take possession of, hold, develop, rent, lease, sell, manage, maintain, operate and otherwise use or permit the use of the Mortgaged Property*** upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances. ***Such receivership may,*** at the option of Lender and unless otherwise limited by any order appointing such receiver, ***continue*** until full payment and performance of the Obligations ***or until title to the Mortgaged Property shall have passed***

> ***by foreclosure sale, <u>receiver sale</u> or deed in lieu of foreclosure***. ***Lender, in its sole discretion, shall be entitled to prosecute through completion in any Civil Action*** one or more causes of action for foreclosure of the Security Instrument, ***to have the Mortgaged Property sold by*** foreclosure sale or ***<u>receiver sale</u> in accordance with applicable law*** [and] ***to obtain any judicial order confirming or approving any such sale***[.]

(*Id*. (emphasis added).)

Notably the Forbearance Agreement specifically provides that the Receiver shall have "full power to take possession of [and] …sell … the Mortgaged Property upon such terms as said receiver may deem to be prudent and reasonable under the circumstances…." (*Id.*)

## VII. <u>Defendants' Inactions Since the Maturity Default Required the Appointment of Receiver</u>

### a. Defendants Failed to Maintain the Collateral Properties

Prior to this Court's appointment of a temporary receiver in this action, Defendants indisputably failed to maintain the Collateral Properties in good working order and repair. In September and October of 2023, Lender caused Allegiant Commercial Asset Services Group ("<u>Inspector</u>") to inspect the Collateral Properties. (Walters Decl. (Dkt. No. 53), Exs. A-AA.) The Inspector issued inspection reports, which included narrative descriptions and a numerical score reflective of each Collateral Property's condition according to definitions established by the Mortgage Bankers Association ("<u>MBA Guidelines</u>"). (*Id.*) Five of the Collateral Properties received the worst rating, "5" out of "5". (*See generally*, Walters Decl. (Dkt. No. 53), Exs. A through AA.) According to the MBA Guidelines, such properties exhibit inferior conditions, multiple non-functioning building components, severe deferred maintenance items, multiple life/safety and continuing code violations. (*Id.*)

Seven of the Collateral Properties received the second worst ratings, "4" out of "5". (*Id.*) According to the MBA Guidelines, such properties exhibit deteriorating conditions, life/safety and

continuing code violations, among other conditions, with deferred maintenance and life/safety issues not being addressed as quickly as required. (*Id.*)

**b. Defendants' Neglect of the Collateral Properties Triggered a Downward Spiral in Condition and Revenue**

Defendants' failure to adequately maintain the Collateral Properties resulted in tenants vacating apartments – in several cases following condemnation by local authorities. (*See Declaration of Whitney B. Wheeler in Support of Plaintiff's Request for Appointment of Receiver* ("Wheeler Receiver Decl."), dated December 12, 2023 (Dkt. No. 51), ¶ 32.) Due to their deteriorating conditions, the Collateral Properties were not attracting replacement tenants resulting in decreased occupancy. (*Id.*) Decreasing occupancy, in turn, resulted in a further drop in revenue, which correspondingly further impaired the ability to maintain the properties. (*Id.*)

This downward spiral was evidenced by the fact that rent collections at the Collateral Properties had been dropping monthly and became insufficient to satisfy Defendants' operational expenses and debt service obligations. (*Id.*, ¶ 33.) For example, in August and September 2023, Defendants' cash management account maintained by Lender contained insufficient funds to make required disbursements. (*Id.*) As of August 24, 2023, Defendants' cash management shortfall was $495,228.47 and as of September 19, 2023, it was $2,232,217.05. (*See* August 2023 Shortfall Notice and September 2023 Shortfall Notice, each attached to the Wheeler Receiver Decl. as Ex 13 and Ex. 14, respectively.)

Generally, when Defendants' cash management account experiences a shortfall, the following month's collections were applied to satisfy amounts that haven't been paid. (Wheeler Receiver Decl. at ¶ 34.) Through September 2023, the cash management account had sufficient funds to cure the prior-month's shortfall. (*Id.*) However, because the Collateral Properties had been losing revenue (as discussed *supra*), Defendants' cash management shortfalls had been increasing and it was taking

*more* than one month's rent collection to cover *one* month's debt service and operational expenses. (*Id.*) As of November 9, 2023, funds on deposit in the cash management account were insufficient by $1,656,04.09 to satisfy Defendants' *October* 2023 disbursement obligations. (*Id.*)

**c. Defendants' Failed to Fund Reserves to Support the Collateral Properties**

On June 5, 2023, Lender released $1,700,000.00 in Forbearance Reserve Funds (as defined in the Forbearance Agreement) for "the payment of any and all costs incurred in connection with the operation, management and/or maintenance of the" Collateral Properties, as provided for in the Forbearance Agreement. (Wheeler Decl., ¶ 50; *see also* Ex. 13 (Forbearance Agreement) § 2.3(b).) With the depletion of that account, Defendants were required, pursuant to the Forbearance Agreement, to deposit $1,700,000.00 with Lender to replenish the Forbearance Reserve Funds on or before July 7, 2023. (*Id.*, ¶ 51; Ex. 13 (Forbearance Agreement), § 2.3(a).) Defendants made a payment of $600,000.00 to replenish the Forbearance Reserve Funds on or about July 13, 2023. (*Id.*, ¶ 55; Smith Decl., ¶ 5.) Despite repeated written demands, Defendants have not paid the remaining $1,100,000.00 to replenish the Forbearance Reserve Funds, resulting in a reserve deficit (Wheeler Decl., ¶¶ 52-58; Smith Decl., ¶¶ 6, 7.)

**d. By Stipulation, Defendants Further Consented to the Appointment of a Receiver**

On January 23, 2024, this Court so-ordered a stipulation by the parties, whereby Defendants consented to the relief sought by Lender's motion (Dkt. Nos. 51-56) for the appointment of a receiver ("Receiver") during the pendency of this action, but reserved their right to contest whether the Receiver may be authorized to sell property of the receivership estate. (*See* So-Ordered Stipulation, Dkt. No. 62.) This Court subsequently entered an order appointing Chris Neilson as the temporary Receiver to, among other things, take possession of, preserve, protect, administer, and collect, improve, lease or repair the property of, the Receivership Estate. (*See* Receivership Order, Dkt. No.

71.) In the So-Ordered Stipulation, Defendants did not contest whether this Court had the authority to appoint a receiver over the Collateral Properties. (Receivership Order, ¶ 4.) Defendants also did not contest that good cause existed for the appointment of a receiver to protect the Receivership Estate (as defined in the Receivership Order). The Receivership Order also expressly provides that the receivership shall continue until "judicial or non-judicial foreclosure proceedings against the entire Receivership Estate shall have been consummated, or upon payment of the Loan in full." (*Id.*, § H.1.)

**e. Receiver's Efforts to Address Degradation**

**<u>Galloway Village (Columbus, OH)</u>**

On January 12, 2024, and again on January 19, 2024, the Prairie Township Board of Trustees ("Prairie Township") filed 12 enforcement actions against defendant Galloway Apartments LLC ("Galloway Owner") claiming violations of the Exterior Property Maintenance Code. (*See Declaration of Chris Neilson, dated February 21, 2025* ("Neilson Decl."), ¶ 7; Ex. 1.) Since taking possession of the Collateral Properties, Receiver has taken steps to address these violations and coordinated the repair of substantial damage to the exteriors of Galloway Village, including trash removal, landscaping, mold remediation, and repairs to damage to interior units. (*Id.*, ¶ 8.) During the Summer of 2024, the Prairie Township evicted all remaining tenants from Galloway Village and formally declared the property to be uninhabitable. (*Id.*, ¶ 10; Ex. 2.) To enforce the decree, the Prairie Township installed fencing around the apartments to prevent any tenants or vagrants from entering the premises. (*Id.*, ¶ 10.) Since then, Receiver and his team has been working with Prairie Township to resolve the outstanding enforcement actions. Given the tremendous damage to the property thus far, the only viable option may be a complete reconstruction, which Receiver's team estimates will cost approximately $13 million. (*Id.*, ¶ 11.)

**High Point in the Park (Elyria, OH)**

In March and April 2024, the City of Elyria filed multiple lawsuits against defendant ROCO-Hight Point in the Park LLC ("High Point Owner") in Elyria Municipal Court claiming dozens of violations of local municipal and building codes, including failure to make required roof, elevator, and garage repairs, as well as fire code violations. (*Id.*, ¶ 12.) Receiver appeared in those lawsuits, in his capacity as Receiver, to avoid default judgments against the Receivership Estate. (*Id.*, ¶ 13.) Receiver has also been working with local officials to remediate existing violations, including regular meetings between Receiver's team and the City Inspector and regular attendance at status conferences in the enforcement actions. (*Id.*) The total dollar figure of the violations is not yet known, but it is expected to exceed $100,000. (*Id.*)

**Parkside Gardens (Euclid, OH)**

In September 2022, the City of Euclid brought criminal charges against defendant ROCO-Parkside, LLC ("Parkside Owner") alleging multiple code violations associated with, among other things, garbage, debris, broken asphalt, broken and missing doors, broken windows, and damaged roofs and ceilings in the lawsuit captioned *State of Ohio and City of Euclid v. ROCO-Parkside LLC*, Case No. 22CRB00984, in the Euclid Municipal Court. Parkside Owner and Joseph Chetrit, Parkside Owner's principal, were both charged. (*Id.*, ¶ 14.) After they failed to appear at multiple hearings, the Euclid Municipal Court sanctioned Parkside Owner and Chetrit $1,000 per day. (*Id.*; Ex. 3) Receiver is working with the Euclid Municipal Court and local officials to make required repairs and resolve outstanding fines, which now total over $100,000. (*Id.*, ¶ 15.)

**Loganberry Ridge (Richmond Heights, OH)**

In October 2023, Richmond Heights sued defendant ROCO Loganberry, LLC ("Loganberry Owner") in Lyndhurst Municipal Court charging multiple building code and fire code violations in

the lawsuit captioned *Richmond Heights v. Hillbrook Club, aka, ROCO Loganberry*, Case No. 23CRB00673. (*Id.*, ¶ 16.) Receiver's team met with local prosecutors, who acknowledge and appreciate Receiver's efforts to make required repairs and otherwise resolve the code violations, including a collapsed garage. (*Id.*) According to Lyndhurst prosecutors, total fines against Loganberry Owner exceed $8 million. Receiver's team maintains communication with prosecutors and the Municipal Court to report progress of addressing the violations. (*Id.*, ¶ 17.) The next hearing in the lawsuit captioned *Richmond Heights v. Hillbrook Club, aka, ROCO Loganberry*, Case No. 23CRB00673 is set for February 27, 2025. (*Id.*)

**Davis Gardens (Pensacola, FL)**

Conditions at Davis Gardens were very poor when Receiver took possession. Immediate repairs total $100,000 to correct non-functional crawl space, dryer vents, debris removal and replacing a walking path fence. (*Id.*, ¶ 18.) Receiver's team estimates that over $400,000 in additional repairs are required at Davis Gardens over the next 60-90 days, including complete renovation of several rooms and roof replacements in four buildings. (*Id.*, ¶ 19.)

**Atwood Oaks (Pensacola, FL)**

Receiver's team estimates that $75,000 worth of immediate repairs are required at Atwood Oaks to repair drainage and electrical problems, major asphalt repairs, replacing rotten wood, debris removal, and pool / deck pump repairs to make the pool operational (currently closed based on requirements from insurer). (*Id.*, ¶ 20.) Over the next 90 days, additional repairs totaling approximately $100,000 are required to repair 12 balconies to comply with building codes and replace broken stairs. (*Id.*) After that, an additional $70,000 in repairs will be needed to renovate four down units due to major plumbing issues, install bollards around a backflow device, and replace 40 shutters. (*Id.*)

**Chateau Royale (Alexandria, LA)**

Receiver's team estimates $280,000 in repairs that will be required in the next 30 days for major balcony and railing issues, major roof repairs, replacing missing condensers, exterior lighting repairs, plumbing problems throughout the property, and repairing broken glass in multiple units. (*Id.*, ¶ 21.) Longer term repairs at Chateau Royale will require at least $340,000 to renovate over 44 down units so that they can be leased, and at least $160,000 to replace outdated electrical panels. (*Id.*)

**Vista Place (Russellville, AR)**

Receiver expects this apartment complex to require at least $170,000 in repairs over the next 30 days, including completing structure repairs to building 2 ($95,000) and completing installation of a concrete trash enclosures ($45,000). (*Id.*, ¶ 22.) Longer term repairs include dumpster enclosures ($45,000), replacing broken breezeway steps ($15,000), and renovating down units ($30,000). (*Id.*)

**Declining Occupancy at the Collateral Properties**

Occupancy at each of the Collateral Properties was near 50% or below when Receiver took possession in February 2024. (*Id.*, ¶ 23; Ex. 4.) Despite Receiver's efforts addressing code violations and other legal and logistical challenges at each property, occupancy at the Collateral Properties that remain in the Receivership Estate continue to plummet. (*Id.*) These Collateral Properties face tremendous challenges in order to turn things around given the waste and neglect at each property prior to Receiver's appointment. (*Id.*, ¶ 23.)

## ARGUMENT

### VIII. Lender has Established its *Prima Facia* Entitlement to Summary Judgment

Lender has established its *prima facie* entitlement to summary judgment. A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is *material* only if it "might affect the outcome of the suit," and is *genuinely in dispute* only if "a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In establishing a mortgage default, the plaintiff meets its *prima facie* burden on a motion for summary judgment by producing the mortgage, the unpaid note, and showing that there has been an uncured default. *Aurora Loan Servs., LLC v. Taylor*, 25 N.Y.3d 355, 360 (2015) (awarding summary judgment).

Here, Lender has met its *prima facie* burden. Lender has established standing because it was the owner and holder of the Loan Documents, including the Note when this action was commenced on November 10, 2023. (Wheeler Decl., ¶ 24.) The Wheeler Decl. attests to Lender's ownership and acquisition of the Note and the various parallel assignments of the Security Instruments in favor of Lender. (*Id.*, ¶ 26.) The Wheeler Decl. further attests to Lender's physical possession of the endorsed Note with the allonge firmly affixed, through its custodian or counsel, since at least July 18, 2019, including on November 10, 2023, when this Complaint was filed. (*Id.*, ¶¶ 24, 28.) *See Taylor*, 25 N.Y.3d at 360 (affidavit testimony demonstrating plaintiff's possession of note prior to commencement of mortgage loan enforcement action sufficient to establish standing).

Moreover, as demonstrated below, there is no dispute that Defendants breached the Loan Documents by failing to (i) pay the outstanding balance of the Loan on or before the Maturity Date, and (ii) fully replenish the Forbearance Reserve Funds on or before July 7, 2023.

Defendants cannot raise a genuine, triable issue of material fact. Accordingly, this Court should grant Lender's motion for summary judgment on all three issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (holding that the Federal Rules of Civil Procedure authorizes "summary judgment upon proper showings of the lack of a genuine, triable issue of material fact."); *Martinez v. Agway Energy Servs., LLC*, 88 F.4th 401, 418 (2d Cir. 2023) (affirming summary judgment where there was no triable issue of fact).

**a. Maturity Default**

Defendants admit that the Loan matured by its terms on July 9, 2022, and that the Loan became immediately due and payable in its entirety upon the occurrence of the Maturity Date. (Answer, ¶¶ 75, 76.) There also is no dispute that Defendants failed to pay the balance of the Loan on or before the Maturity Date. (Wheeler Decl., ¶ 34.) Indeed, Defendants expressly admitted in the Forbearance Agreement that they failed "to pay the entire outstanding principal balance of the Loan, all accrued and unpaid interest, and all other amounts due under the Loan Documents on the Maturity Date of the Loan." (Wheeler Decl., ¶ 35, Ex. 13 (Forbearance Agreement), Recital G; *see also id.* at § 1.1 ("The foregoing recitals are incorporated herein as a substantive, contractual part of this Agreement.")

**b. Failure to Replenish the Forbearance Reserve Funds**

On June 5, 2023, Lender released $1,700,000.00 in Forbearance Reserve Funds (as defined in the Forbearance Agreement) for "the payment of any and all costs incurred in connection with the operation, management and/or maintenance of the" Collateral Properties, as provided for in the Forbearance Agreement. (Wheeler Decl., ¶ 50; *see also* Ex. 13 (Forbearance Agreement) § 2.3(b).) With the depletion of that account, Defendants were required, pursuant to the Forbearance Agreement, to deposit $1,700,000.00 with Lender to replenish the Forbearance Reserve Funds on or before July 7, 2023. (*Id.*, ¶ 51; Ex. 13 (Forbearance Agreement), § 2.3(a).) Defendants made a payment of $600,000.00 to replenish the Forbearance Reserve Funds on or about July 13, 2023. (*Id.*, ¶ 55; Smith Decl., ¶ 5.) Despite repeated written demands, Defendants have not paid the remaining $1,100,000.00 to replenish the Forbearance Reserve Funds, resulting in a reserve deficit. (Wheeler Decl., ¶¶ 52-58; Smith Decl., ¶¶ 6, 7.)

**c. Failure to Cure**

Neither of these defaults have been cured. (*Id.*, ¶ 58.) Accordingly, the burden shifts to Defendants to adduce proof, in admissible form, which creates a material fact to require a trial. *See*

*Prudential Home Mortg. Co. v. Cremele*, 226 A.D.2d 357, 357 (2d Dep't 1996) ("[o]nce the movant has demonstrated a *prima facie* showing of entitlement to judgment, the burden shifts to the party opposing the motion to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action."). Defendants have not and cannot do so.

**d. The Forbearance Agreement Grants the Receiver the Power of Sale**

Defendants can offer no basis to dispute that the Receiver, which it previously consented to and this Court appointed, should continue in accordance with Receivership Order. In that regard, the So-Ordered Stipulation appointing the Receiver provides that the Receiver should remain in place until "judicial or non-judicial foreclosure proceedings against the entire Receivership Estate shall have been consummated, or upon payment of the Loan in full." (Receivership Order, § H.1.)

Moreover, Defendants cannot dispute that they agreed, in the Forbearance Agreement, that any receiver sought by Lender would be vested with the full power to sell property of the Receivership Estate. Specifically, Defendants agreed to confer upon the receiver "***all of the usual powers and duties of receivers*** under applicable law and/or pursuant to local custom, ***including the full power to*** take possession of, hold, develop, rent, lease, ***sell***, manage, maintain, operate and otherwise use or permit the use of ***the Mortgaged Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances***." (Wheeler Decl., Ex. 13 (Forbearance Agreement), § 3.11(d) (emphasis added).)

Contracts are to be construed in accordance with the parties' intent. *See, e.g., Slatt v. Slatt*, 64 N.Y.2d 966 (1985). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018 (1992). In that regard, words and phrases are to be given their plain reading. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005). Significantly, a court should not, in the guise of interpreting a

contract, add or excise terms or distort the meaning of those used to make a new contract for the parties. *Teichman by Teichman v. Community Hosp. of W. Suffolk*, 87 N.Y.2d 514, 520 (1996); *Morlee Sales Corp. v. Manufacturers Trust Co*., 9 N.Y.2d 16, 19 (1961); *Bank of New York Tr. Co., N.A. v. Franklin Advisers*, 726 F.3d 269, 278 (2d Cir. 2013) ("when interpreting a contract the entire contract must be considered so as to give each part meaning") (quotations omitted). The New York Court of Appeals has stressed that it is particularly important that a written agreement "be enforced according to its terms" where the agreement concerns real property and "was negotiated between sophisticated, counseled business people negotiating at arm's length." *Vermont Teddy Bear Co., Inc. v. 538 Madison Realty Co*., 1 N.Y.3d 470, 475 (2004) (internal citations and quotations omitted).

Here, Defendants should not be allowed to void the rights it expressly conferred to Lender in the Forbearance Agreement with regard to the Receiver having the power of sale. Nor can it ask this Court to ignore the express terms of the Forbearance Agreement on this issue in contradiction to the parties' expressed intent. *See Jin Ming He v. Jong Tien Ho*, 23 A.D.3d 524, 525 (2d Dep't 2005) ("Courts shall enforce the intent of the parties as expressed by the plain language of their contracts."). The argument advanced by Defendants to contrary do not withstand scrutiny.

Defendants previously have argued that the powers of the receiver enumerated in the Forbearance Agreement—namely, to "hold, develop, rent, lease, sell, manage, maintain, operate and otherwise use or permit the use of the Mortgaged Property"—are "qualified" and "potential" powers. (*See Defendants' Opposition to Plaintiff's Motion for Appointment of Receiver*, Dkt. No. 63, at 4.). Defendants' reading is misplaced. Yet, nothing in the express language of the Forbearance Agreement states that these powers are simply "qualified" or "potential" options that might exist or not exist. Instead, the parties agreed unequivocally, in the Forbearance Agreement, that "any order

appointing a receiver **shall** provide…" the receiver with all the "usual powers and duties of receivers.…" (Wheeler Decl., Ex. 13 (Forbearance Agreement), § 3.11(d) (emphasis added).)

To eliminate any ambiguity about what was intended to be included in those "usual powers and duties," the parties provided a list: "***including the full power to*** take possession of, hold, develop, rent, lease, ***sell***, manage, maintain, operate and otherwise use or permit the use of ***the Mortgaged Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances***." (*Id.*) Where parties have provided a list following the term "including," the plain intent is that the items that follow the term including clarify and delineate scope. *See EMI Catlogue P'ship v. CBS/FOX Co.*, No. 86 CIV 1149 (PKL), 1994 WL 163700, at *14 (S.D.N.Y. Apr. 28, 1994) ("The most natural reading of the term 'including' [in a relative clause of a contractual sentence] is simply that the broad reservation of rights expressed in the first clause"). The Forbearance Agreement thus empowers the receiver with one of the usual powers conferred on receivers, including the right to "sell … the Mortgaged Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances." (Wheeler Decl., Ex. 13 (Forbearance Agreement), § 3.11(d).)

That Defendants expressly agreed to confer on the receiver the power to sell the property of the Receivership Estate is underscored when the Forbearance Agreement is read in its entirety. *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 443 (S.D.N.Y. 2021) ("[I]t is a fundamental precept of contract law that agreements must be read in their entirety and that no provision of a contract draws the entirety of its meaning from examining is language in isolation."); *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993) ("By examining the entire contract, we safeguard against adopting an interpretation that would render any individual provision superfluous."). In particular, the next sentence in Section 3.11(d) provides

that "[s]uch receivership may … continue until … title to the Mortgaged Property shall have **passed by … receiver sale**…." (Forbearance Agreement § 3.11(d)) (emphasis added.) And the sentence that follows continues this theme, granting Lender the right to have the Mortgaged Property sold by the receiver: "**Lender**, in its sole discretion, **shall be entitled** … **to have the Mortgaged Property sold by** … **receiver sale** in accordance with applicable law **[and] to obtain any judicial order confirming or approving any such sale[.]**" (*Id.*) (emphasis added.)

Defendants also waived any right to challenge the Lender's right to seek the appointment of a receiver with the power of sale:

> (i) **irrevocably consent to such receiver appointment**, (ii) **knowingly and voluntarily waive any and all defenses to**, and any and all rights to enjoin, appeal or otherwise interfere with, hinder or impede, **any such motion, application or receiver appointment**, … (iv) agree **not to oppose** any motion or application by Lender for such receiver appointment….

(*Id.* (emphasis added).)

Furthermore, even if § 3.11 of the Forbearance Agreement were to be read, as urged by Defendants, to condition the receiver's powers on applicable law and/or custom, the receiver would still have the power to sell the property of the Receivership Estate. The parties in the Loan Agreement agreed that New York law would govern "THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER." (Wheeler Decl. Ex. 2 (Loan Agreement), § 10.3.) Under New York law, courts may grant receivers the right to sell receivership property. CPLR § 5228(a) provides that a "court may appoint a receiver who may be authorized to administer, collect, improve, lease, repair or sell any real or personal property in which the judgment debtor has an interest or to do any other acts designed to satisfy the judgment." New York state courts have empowered receivers with the right to sell receivership property. *See, e.g.*, *Good Gateway, LLC v. Thakkar*, 220 A.D.3d 570, 571 (1st Dep't

2023), *leave to appeal dismissed*, 41 N.Y.3d 1014 (2024) (vesting the receiver with the power to sell a condominium); *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 317 (2010) (affirming the trial court's decision to vest the receiver with the power to sell property of the receivership estate); *Chlopecki v. Chlopecki*, 296 A.D.2d 640, 641 (3d Dep't 2002) ("the court may, in its discretion, appoint a receiver to sell any real property in which the judgment debtor has an interest for the purpose of satisfying an outstanding judgment.").

Courts in this jurisdiction also have granted receivers with the right to sell collateral property. *See e.g., Sec. & Exch. Comm'n v. Byers*, 08 CIV. 7104 (DC), 2014 WL 12799633, at *3 (S.D.N.Y. Feb. 21, 2014) (citing 28 U.S.C. § 754[2] and holding that "the power of sale is within the scope of a receiver's 'complete control' over receivership assets.") (citations omitted); *see also U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*, 866 F. Supp. 2d 247, 257 (S.D.N.Y. 2012) (upholding the right of receiver to sell collateral property "to avoid a substantial and preventable decline in the value of its collateral"); *see also RSS CSMC2021 – ADV - DE AUR, LLC v. Adventus US Realty #4 LP*, Case No. 23-0231 (S.D.N.Y. Sep. 22, 2023) at Docket No. 37 at 4 (empowering receiver to sell property of the Receivership Estate) and 12 (authorizing the receiver to engage a real estate broker to market estate property for sale); *Bank of America, N.A. v. BK Inner City Chicken Inc*., Case No. 09-06789-LAK (S.D.N.Y. Feb. 5, 2013) at Docket No. 60 at 2 (authorizing temporary receiver to sell and convey assets of the receivership defendants).

2 There are various federal statutes, which collectively address the fact that federal courts may empower receivers to sell receivership property located in multiples states, as is the case here. Each of 28 U.S.C. § 754 (receivers of property in different districts), 28 U.S.C. § 2001(a) (addressing how a receiver appointed by a federal court should sell property), and 28 U.S.C. § 3103(b)(B) (a receiver may be authorized "to administer, collect, improve, lease, repair or sell pursuant to section 3007 such real and personal property as the court shall direct") is relevant.

As the parties recognized when they executed the Forbearance Agreement, the best way to avoid continued degradation of the collateral and to maximize their value is to sell them. Defendants also unambiguously agreed that granting the receiver authority to sell was necessary to continue the plan that the parties had already set in motion. Failure to do so would risk further harm to the Remaining Collateral Properties. Finally, it is in the parties' best interest to maximize the sale price of each of the Remaining Collateral Properties. The best way to accomplish that would be to have the receiver sell them, as opposed to judicial foreclosure sales, particularly since, as explained by the Receiver, many of the Remaining Collateral Properties are in decrepit condition and require substantial work. This Court should, therefore, grant summary judgment for Lender and authorize the receiver to sell the Remaining Collateral Properties. *See Fischer & Manell, LLP v. Citibank, N.A.,*, 632 F.3d 793, 799–802 (2d Cir. 2011) (affirming the district court's grant of summary judgment to the movant on finding the contract terms clear and unambiguous).

## IX. <u>The Forbearance Agreement Obligates Borrower Defendants to Cure the Forbearance Reserve Funds' Deficit</u>

Simultaneously with the execution of the Forbearance Agreement, Lender released $1,700,000.00 in Forbearance Reserve Funds for "the payment of any and all costs incurred in connection with the operation, management and/or maintenance of the" Collateral Properties. (Wheeler Decl., ¶ 50; *see also* Ex. 13 (Forbearance Agreement) § 2.3(b).) With the depletion of that account, Defendants were required to deposit $1,700,000.00 with Lender to replenish the Forbearance Reserve Funds on or before July 7, 2023. (*Id.*, ¶ 51; Ex. 13 (Forbearance Agreement), § 2.3(a).) Defendants made a payment of $600,000.00 to replenish the Forbearance Reserve Funds on or about July 13, 2023. (*Id.*, ¶ 55; Smith Decl., ¶ 5.) Despite repeated written demands, Defendants have not paid the remaining $1,100,000.00 to replenish the Forbearance Reserve Funds, resulting in a reserve deficit. (Wheeler Decl., ¶¶ 52-58; Smith Decl., ¶¶ 6, 7.)

Because Defendants indisputably have not fully replenished the Forbearance Reserve Funds, Lender's motion for summary judgment should be granted. *Mergent Servs. v. Nova Info. Sys., Inc.*, 249 Fed. App'x 251, 252 (2d Cir. 2007) (holding that "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.") (quotations omitted).

## X. <u>Borrower Defendants Are Contractually Obligated to Turn Over Financial Accounts</u>

There can be no dispute that Lender is entitled to an accounting. The Loan Agreement unequivocally provides that:

> "Lender shall have the right . . . to examine [] books, records and accounts [reflecting all of the financial affairs of Borrower and all items of income and expense in connection with the operation on an individual basis of the Properties.] After the occurrence and during the continuance of an Event of Default, Borrower shall pay any reasonable out of pocket costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Properties, as Lender shall determine to be necessary or appropriate in the protection of Lender's interest."

(Wheeler Decl, Ex. 2 (Loan Agreement), § 5.1.11(a)).

The Loan Agreement also requires Defendants to provide Lender with "detailed financial information with respect to the operation of the [Collateral] Properties and the financial affairs" of Defendants. (*Id*. § 5.1.11(f).) Despite repeated demands, Defendants have not provided such information to Plaintiff. (Wheeler Decl., ¶ 60.)

Because Defendants "unambiguously agreed to" provide their financial books, records and account, and cannot "raise any legitimate defense" for their failure and refusal to turn over to Lender those financial documents, "[Lender] is entitled to summary judgment." *Cuadrado v. Zito*, No. 13 CV 3321 VB, 2014 WL 1508609, at *3 (S.D.N.Y. Mar. 21, 2014).

## CONCLUSION

For all of the foregoing reasons, Lender's motion for summary judgment should be granted.

Dated: February 21, 2025

**BRYAN CAVE LEIGHTON PAISNER LLP**

By: *[/s/ Noah M. Weissman]*
Noah M. Weissman
Matias R. Gallego-Manzano
Anoop Sadanandan
1290 Avenue of the Americas
New York, New York 10104
T: (212) 541-2000
noah.weissman@bclplaw.com
matias.gallegomanzano@bclplaw.com
anoop.sadanandan@bclplaw.com

*Attorneys for Wells Fargo Bank, National Association, as Trustee for the Benefit of Holders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP*